UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
EMILY K. BARNES,

        Plaintiff,

   v.

INTL FCStone Financial Inc.,

        Defendant.
------------------------------------------------------------X

Index No.

**COMPLAINT**

**Jury Trial Demanded**

Plaintiff Emily K. Barnes hereby alleges as follows:

**PRELIMINARY STATEMENT**

1. INTL FCStone Financial Inc. ("INTL" or the "Company") brands itself as a Fortune 500 company that is a "pioneer in specialized financial services."[1]

2. Unfortunately, INTL does not hold itself to the same pioneering standard when it comes to equal opportunity for its employees. Instead, INTL has fostered a boys' club atmosphere that praises and promotes male employees, while demeaning and ignoring equally qualified and accomplished women.

3. Indeed, Ms. Barnes was **the only woman among 40 traders** on INTL's securities desk during her two years as a Securities Lending trader at the Company from April 2017 to March 2019.

4. The Company's lack of commitment to promoting and protecting female employees also allowed Ms. Barnes to be the target of incessant sexual harassment and gender discrimination by her two male supervisors, Larry Meyers and Rob Cleary, whose conduct was

---

[1] *About Us,* https://www.intlfcstone.com/About/ (last visited July 11, 2019).

notorious.  Despite wide knowledge of her supervisors' conduct, INTL did nothing to support her.

5.	Mr. Meyers made it clear to Ms. Barnes that her role at INTL, as the only woman on the team, was to **"go out with clients"** and **"look hot."**  He also constantly made comments about **"how good"** Ms. Barnes looked or which clients she should **"date."**

6.	Even worse, after Ms. Barnes reported to Mr. Meyers that an older male client had **grabbed her buttocks** during a business dinner, Mr. Meyers responded that, "**Good, maybe you'll get a trade tomorrow**" and "**You should date him.**"

7.	This blatant sexual harassment and disrespect for women at INTL was only possible due to disdain for professional and diversity-friendly workplace standards of conduct.  At one point, Ms. Barnes witnessed a conversation between Mr. Meyers and Mr. Cleary in which one said to the other, "**It's crazy how you can't say anything to anyone anymore because of this #MeToo movement**."  The other man responded, in sum and substance, "**Yep, I don't even want to hire women anymore.  Too much at risk**."  This inherently discriminatory viewpoint seems to have been shared by others at INTL, given the dearth of women in business-side jobs at the Company.

8.	Ms. Barnes was a high-performing employee during her two years at the Company, and she worked diligently to book more trades than the majority, and sometimes all, of her male counterparts.

9.	Her hard work made no difference, however, as, in keeping with their disregard for Ms. Barnes's welfare, INTL, at the behest of Mr. Meyers and Mr. Cleary abruptly terminated Ms. Barnes on March 22, 2019, just as she finished training a new male employee to work in her same position.

## ADMINISTRATIVE PREREQUISITES AND PROCEDURAL BACKGROUND

10. On October 10, 2019, Ms. Barnes filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act of 1964. On January 11, 2020, Plaintiff received a Notice of Right to Sue and asserts her Title VII claims within 90 days of the receipt of the EEOC's Notice of Right to Sue.

11. Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

12. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII.

13. Pursuant to 28 U.S.C. § 1391 and 29 U.S.C. § 1132(e), venue is proper in this district because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

14. Plaintiff Emily K. Barnes is a former employee of the Company and resident of the State of New York, New York County. At all relevant times, Ms. Barnes met the definition of an "employee" under all applicable statutes.

15. Defendant INTL is a corporation organized and existing under the laws of the State of Florida, with its headquarters at 708 Third Avenue, New York, New York 10017. At all relevant times, INTL met the definition of an "employer" under all applicable statutes.

**FACTUAL ALLEGATIONS**

I.  **Ms. Barnes's Professional Background**

16. Before she worked at INTL, Ms. Barnes successfully built a career in the securities lending business, an insular industry on Wall Street that is dominated by men who are often twice Ms. Barnes's age.

17. After graduating from the Business School at George Washington University in 2007, Ms. Barnes worked as a Portfolio Analyst on the international equities desk at ProShares Advisors, a leveraged Exchange Traded Funds provider.

18. In March 2010, Ms. Barnes accepted a position at Banca IMI Securities, Inc. ("Banca IMI") in New York, where she was an Equity Finance Sales Trader.

19. At Banca IMI, Ms. Barnes worked tirelessly and eventually became a Global Equity Sales Trader. Her corporate title at that time was Vice President ("VP").

20. In January 2017, many employees were being laid off at Banca IMI, and Ms. Barnes grew concerned about her job security there. She learned of an opportunity at INTL from one of her former supervisors, Larry Meyers, who had recently moved from Banca IMI to INTL.

21. Ms. Barnes sent Mr. Meyers her resume, and she soon accepted an offer to become the VP of Principal Equity Finance in the Broker-Dealer division at INTL.

II. **Ms. Barnes Is Subjected To Sexual Harassment And Gender Discrimination At INTL**

22. In April 2017, Ms. Barnes started work at INTL under the supervision of Mr. Meyers, who was the Managing Director ("MD") of her group, Principal Equity Finance. Ms. Barnes had never previously worked so closely with Mr. Meyers.

23. Ms. Barnes soon discovered that she was one of very few, and perhaps the only, female traders on the floor, out of 40 traders.

24. When INTL finally did hire another woman, Jill Mandarino, she was placed in the Miami office, and as a result, Ms. Barnes remained one of the few professional women working on the business side in the New York office. This glaring lack of female representation is chronic at INTL, which has been listed as one of the biggest U.S. companies with no women on its corporate board.[2]

25. This lack of female representation made it much more difficult for Ms. Barnes to feel comfortable reporting alarming conduct by Mr. Meyers, who repeatedly appeared impaired by alcohol in the office and would engage in highly inappropriate furious rants and tantrums towards Ms. Barnes in particular, and never against any of her male colleagues.[3]

26. Mr. Meyers also often tasked Ms. Barnes with clerical and administrative assignments, which he did not direct her male colleagues to undertake.

27. Amid such offensive and startling behavior, Mr. Meyers also made it clear to Ms. Barnes that her role at INTL as the only woman on the team was to "**go out with clients**" and "**look hot**."

28. In fact, Mr. Meyers frequently made comments about "**how good**" Ms. Barnes looked or which clients she should "**date**." Mr. Meyers outright said to Ms. Barnes on frequent occasion, "**you're beautiful; everybody loves you.**"

---

[2] *These 48 Major U.S. Companies Have Zero Women On Their Boards,* http://5050x2020.org/these-48-major-us-companies-have-zero-women-on-their-boards/ (last visited July 11, 2019).

[3] It was a well-known fact at INTL that Mr. Meyers had a generally consistent daily schedule: he would leave the office around 11 a.m. to "meet clients," which really meant that he was going to a bar or restaurant where he would drink to excess. While out to lunch, he would often meet one of his mistresses—Mr. Meyers is approximately 55 years old, has been married for over 15 years, and has three children—and sometimes would not return to the office until around 3 p.m. On various occasions, he simply would not come back to the office at all.

29. For example, in the summer of 2017, Mr. Meyers and Ms. Barnes went to dinner with a client, who was a man in his late 60s.

30. At some point during the dinner, the client grabbed Ms. Barnes's backside without provocation or consent. Ms. Barnes was obviously shocked, horrified and speechless.

31. When she reported this incident to Mr. Meyers after the dinner, his response was, "**Good, maybe you'll get a trade tomorrow,**" and "**You should date him.**" Ms. Barnes was of course disgusted and hurt by this suggestion.

32. To add insult to injury, Mr. Meyers continued to direct Ms. Barnes to "get drinks and flirt" with this client. Ms. Barnes objected and complained to him that she had not been hired to "flirt with clients."

33. After this incident and Mr. Meyers's callous reaction, Ms. Barnes was understandably reluctant to go to more client dinners with Mr. Meyers, who seemingly had encouraged and, at the very least, fully allowed a client to assault Ms. Barnes in a sexual manner.

34. In the fall of 2017, Mr. Meyers often demanded that Ms. Barnes come with him to client drinks and dinners, which Ms. Barnes declined, as she was fearful of sexual harassment and assault.

35. This made Mr. Meyers furious, and he would shout at her in anger, "**I don't need a clerk; I need a salesperson.**" Mr. Meyers continued to press Ms. Barnes to flirt and entertain male clients. Naturally, he never encouraged his male subordinates to do the same.

36. Ms. Barnes refused to engage in this type of so-called "sales" activity that Mr. Meyers had in mind for her.

37. To Ms. Barnes's horror, Mr. Meyers also would often regale her with tales about the many young women he was dating outside of his marriage, and the sexual acts they would perform for and on him.

38. He described his sex life to Ms. Barnes in detail, and he frequently introduced Ms. Barnes to these women.

39. This always made Ms. Barnes extremely uncomfortable, to say the least. Not only was she disgusted as a woman that her boss would detail his sexual escapades to her, but Ms. Barnes was additionally distressed and humiliated by the fact that she had met Mr. Meyers's wife many times throughout the years, and she had even babysat for his children once during a family emergency.

40. Mr. Meyers showed clearly that he did not care about making Ms. Barnes uncomfortable in the workplace with his detailed sexual discussions.

41. On one occasion, in November 2017, Mr. Meyers and Ms. Barnes went to Miami to train Ms. Mandarino, who had recently been hired by INTL.

42. When Ms. Barnes and Mr. Meyers left the Miami office after the first day of the training, Mr. Meyers casually said to Ms. Barnes, "**Oh, I brought Narissa with me. She's coming to dinner.**"

43. Narissa was Mr. Meyers's most recent girlfriend—she was, true to his usual "type," a young bartender who he had described in detail to Ms. Barnes, saying things like, "**She's so hot**."

44. That night, Ms. Barnes was forced to awkwardly sit through a work dinner with her boss and her boss's mistress, whose meal also was expensed to INTL by Mr. Meyers. Those

were funds that, among other things, could otherwise have been part of the bonus pool for INTL's employees.

45. In September 2018, Mr. Meyers hired Robert Cleary as a Senior VP in the Principal Equity Finance group.

46. This meant that Mr. Cleary was senior to Ms. Barnes, but they both reported to Mr. Meyers. Mr. Meyers and Mr. Cleary had a longstanding personal acquaintance, as their parents had been friends for many years and they are approximately the same age.

47. As a result, Mr. Cleary and Mr. Meyers had spent much time with each other. Mr. Cleary – who had the unnerving and blatantly sexist habit of commenting on a woman's appearance any time a woman walked into the room – only exacerbated the already existing sexist environment in the workplace.[4]

48. By way of example only, one day in the fall of 2018, Mr. Meyers and Mr. Cleary were having a conversation directly in front of Ms. Barnes in which one said to the other, **"It's crazy how you can't say anything to anyone anymore because of this #MeToo movement."** The other man responded in sum and substance, "**Yep, I don't even want to hire women anymore. Too much at risk**."

49. Each time that Mr. Cleary commented on a woman's appearance, Ms. Barnes was made so uncomfortable by his obvious objectification of women that she would quickly try to change the subject.

50. Ms. Barnes observed that Mr. Cleary treated women as objects, and it was a well-known fact that Mr. Cleary had worked at many other companies where the desks he worked on

---

[4] Mr. Cleary also openly engaged in racist and intolerant conduct at work. In November 2018, he referred to an African-American client as a "colored fellow" in Ms. Barnes's presence. He also complained about the "whiny Jewish kids" who came to his home to trick-or-treat on Halloween, and proudly told anyone who would listen that he refused to give them any candy.

8

were always male-dominated and that very few women had ever worked for him in anything other than administrative roles.

51. Because Mr. Meyers was absent from the office so often, in the fall of 2018 Ms. Barnes found herself working with Mr. Cleary very regularly on a one-on-one basis.

52. She noticed right away that Mr. Cleary needed a lot of assistance booking trades, and he frequently asked Ms. Barnes for help.

53. On average, Ms. Barnes booked hundreds of trades a day, whereas Mr. Cleary regularly struggled to book around two dozen. Therefore, it is unsurprising that Ms. Barnes's individual contributions to the overall profit on the desk ranged from 50%-85% of the desk's total income each day.[5]

54. Nevertheless, Mr. Meyers berated Ms. Barnes almost daily, and he refused to give her any autonomy over her deals and trades simply because she is a woman.

55. Mr. Cleary also seemed to have become threatened by Ms. Barnes's performance and her willingness to call him out on his mistakes. In fact, Mr. Cleary treated her in the same manner that he treated the other women who he worked with – as though she was his personal assistant.

56. To make matters worse, Mr. Meyers gave the two men on his team "profit centers," but refused to allow Ms. Mandarino and Ms. Barnes to work together on a profit center.

57. A profit center is a way to track an employee's individual trading profit and expenses. Conferral of a profit center on an employee also demonstrates that an MD finds a trader valuable enough to allow him or her to generate his or her own individual fees. Denying an employee a profit center is tantamount to demotion or a purposeful decrease in compensation.

---

[5] This percentage excludes Mr. Cleary's and Mr. Zarcone's (another MD) profit centers, which were typically excluded from the desk's overall income stream.

58. In keeping with advantages received by other male employees, Mr. Cleary received his own profit center on or around his first day at INTL. Even though Mr. Cleary was booking trades incorrectly in his profit center, Mr. Meyers allowed Mr. Cleary to retain his profit center, yet refused to give one to Ms. Barnes, despite the fact that she repeatedly asked for one.[6]

59. There was no sincere, non-discriminatory basis for Mr. Meyers to continually refuse a profit center to Ms. Barnes. This discriminatory, unequal treatment went along with his contemptuous behavior towards Ms. Barnes and other women in the workplace and other settings, which displayed his gender-based bias and motivation.

60. Mr. Meyers and Mr. Cleary were not the only two men who created a sexist and hostile work environment for Ms. Barnes. Philip Jason Ling, the Head of Operations, also commented on Ms. Barnes's appearance every time he would speak to her.

61. By way of example only, in October 2017, a few months after Ms. Barnes had started working at INTL, Mr. Ling said to her, in Mr. Meyers's presence, "**You're pretty so you don't need to be smart.**"

62. Ms. Barnes was clearly insulted by this comment and told Mr. Meyers that it was inappropriate. Mr. Ling, who worked out of the Florida office, continued to speak to Ms. Barnes in this inappropriate manner. During their phone calls, which occurred approximately three times each month, he repeatedly asked Ms. Barnes if she had "broken up with her boyfriend yet" and would tell her how "hot" she was.

63. Ms. Barnes complained to Mr. Meyers about this conduct repeatedly and told him that she was shocked at "**how inappropriate Jason is when he speaks to me over the phone, which is a recorded line.**"

---

[6] Mr. Cleary appeared to be falsely inflating his individual contributions and taking away money from the overall desk income. This behavior should not have been rewarded.

64. Then, at the Company Holiday Party in January 2019, Mr. Ling took his sexual harassment of Ms. Barnes to the next level. He asked her about her boyfriend, whether they were still together, and, shockingly said "**How many times a day do you guys have sex?**"

65. Naturally, Ms. Barnes refused to answer this question, and walked away from Mr. Ling. At this point, the barrage of inappropriate commentary she received from her male colleagues daily had deadened Ms. Barnes's reactions to such treatment, and she could not summon the strength or indignation to object to every instance of harassment, discrimination and mistreatment. Still, she found it appalling that the Head of Operations would speak to her in this manner.

66. Mr. Meyers was well aware of Mr. Ling's comments. In fact, on one occasion in February or March of 2019, Ms. Barnes was at the airport on a work trip with Mr. Ling. Mr. Ling texted Mr. Meyers to inform him that he was with Ms. Barnes and Mr. Meyers's response was, "behave yourself." Mr. Meyers took no further action to correct Mr. Ling's obvious sexist conduct towards Ms. Barnes.

### III. Ms. Barnes Engages In Protected Activity

67. In December 2018, INTL had a client, RenCap, that did a trade with INTL for T+1 (normally trades settle T0) to fund shares of a stock called PDD, in which RenCap was long (a long position—also known simply as being "long" with regard to a given equity or investment—is the buying of a stock, commodity or currency with the expectation that it will rise in value).

68. In this type of funding trade, the client was essentially paying INTL for cash that INTL put up to settle the trade because the client did not have sufficient cash to do so on its own. The client paid INTL a rate of 2.5%.

69. This particular stock was a "hard-to-borrow security," meaning that INTL would be able to lend the shares at a negative rate, thus increasing INTL's income.

70. The next day, Mr. Meyers directed that it was very important that the shares be lent to client Velocity Capital that same day, and so Ms. Barnes did so.

71. This was unusual, as Mr. Meyers generally did not concern himself with the day-to-day activities on the desk.

72. However, when Ms. Barnes needed the shares back a few days later, Velocity Capital informed her that Mr. Meyers told them that the shares were being sourced by a man named Charles McSwiggan.

73. Mr. McSwiggan is a finder who lives in London; INTL had no trading agreements with him.[7]  Velocity Capital further explained that they therefore did not have the shares to return to INTL.

74. Ms. Barnes knew that this had been a lie by Mr. Meyers, and that the trade had nothing to do with Mr. McSwiggan, as the transaction in fact was just a funding trade with RenCap.

75. Distraught by this revelation, Ms. Barnes looked around for Mr. Meyers, but he was off the desk and out somewhere, as he so often was.

76. Ms. Barnes accordingly relayed the incident to Mr. Cleary, who is a Series 24 holder, and he responded that, "**I don't want to know anything about it**."  Mr. Cleary was

---

[7] A finder is someone who does not have any direct trading agreements with banks or broker dealers, and instead has clients sign finder agreements in which the finder is paid based upon trades he or she generates.  Ms. Barnes had never worked with finders in the past, as she knew many had been banned from the securities industry for improperly transacting under such agreements.

evidently annoyed that Ms. Barnes was trying to involve him in her attempt to keep their desk's practices ethical and professional.

77. When Mr. Meyers eventually returned to the office later that day, Ms. Barnes had the courage to confront him and ask him why he told Velocity Capital that Mr. McSwiggan was sourcing the shares, when he knew that was not the case.

78. Mr. Meyers replied that he had merely "**told a little lie to our client** in order to help [his] friend Charles."

79. Ms. Barnes contemplated reporting this to compliance immediately, but was fearful of retaliation from Mr. Meyers, as he was becoming increasingly angry and verbally abusive towards her.

80. Furthermore, she had already complained about and reported Mr. Meyers's misrepresentation to Mr. Cleary, a Series 24 holder, and he had dismissed her outright.

81. In January 2019, Ms. Barnes also complained – as she had been doing for many months prior – to Mr. Meyers about Mr. Ling's comments about her appearance over the phone.

82. Ms. Barnes further complained and asked – especially during the months of February and March 2019 – why she was not being given a profit center.

83. In typical fashion, Mr. Meyers ignored Ms. Barnes. After all, he had fostered the sexist work environment to begin with and encouraged his male colleagues to objectify and dismiss women regularly – so this conduct seemingly was not out of the ordinary in his mind.

**IV. Ms. Barnes Is Terminated In Retaliation for Protected Complaints, and as a Final Exclamation Point on the Sexually Discriminatory and Disrespectful <u>Treatment She Suffered at INTL</u>**

84. At the beginning of March 2019, Mr. Cleary and Mr. Meyers hired Joseph Pagano into the Principal Equity Finance group.

85. Mr. Pagano is the son of Mr. Cleary's best friend and had recently graduated from college.

86. Shockingly, Mr. Pagano was paid almost as much as Ms. Barnes (approximately $90,000), and was given the same corporate title as Ms. Barnes and Ms. Mandarino – VP – even though he had no relevant work experience and was not licensed.

87. At the time, Ms. Mandarino and Ms. Barnes had over nine years of work experience each and were properly licensed.

88. Ms. Barnes trained Mr. Pagano on how to perform his role (since they were both VPs) over the course of the next three weeks.

89. Little did Ms. Barnes know that she was training Mr. Pagano to take over her position.

90. On March 22, 2019, Mr. Meyers called Ms. Barnes into his office and abruptly terminated her.

91. He told her that her position was being eliminated and gave no further explanation.

92. It is not a coincidence that Ms. Barnes was terminated just as she finished training a man to take over her *exact position*.

93. Upon information and belief, Mr. Cleary became threatened by Ms. Barnes, and heard that Ms. Barnes had been complaining about him to Mr. Meyers. In the months leading up to Ms. Barnes's termination, Mr. Cleary convinced Mr. Meyers that Ms. Barnes was "not a producer," was easily replaceable, and that Mr. Pagano – a man – would be a much better fit for Ms. Barnes's role.

94.     The gender-related animus present in this decision is even more apparent given Mr. Meyers's and Mr. Cleary's blatant and hostile discriminatory and sexual remarks to Ms. Barnes during her employment at INTL, many of which related directly to how they viewed her value (or lack thereof) to the Company.

95.     INTL's abrupt termination of Ms. Barnes makes clear that the decision to falsely "eliminate" her role is nothing more than mere pretext, designed to conceal the real discriminatory and retaliatory reasons the Company terminated Ms. Barnes – on the basis of her gender and because she had, just three months before, displayed the nerve to confront Mr. Meyers about and challenge his fraudulent conduct.

**V.      Post-Lawsuit Retaliation by Defendant INTL and Cleary Towards Ms. Barnes**

96.     This action was originally filed in New York County Supreme Court on August 22, 2019.  At least since that date and perhaps before, Mr. Cleary has been spreading false information to colleagues at INTL and within the broader securities lending industry – including to Ms. Barnes's partner – about Ms. Barnes's performance.

97.     In particular, Mr. Cleary has been falsely stating to individuals in the industry, including prospective future employers, that Ms. Barnes was terminated from INTL because she was "not a producer."

98.     In fact, right after Ms. Barnes was terminated from INTL, she interviewed at the Bank of Montreal with the Head of the Securities Lending group, Tony Zenditti.  Mr. Zenditti informed Ms. Barnes that Mr. Cleary had told him that Ms. Barnes "is not a producer and there are more qualified people out there."  As a result, Ms. Barnes was not hired at Bank of Montreal.

99.     Additionally, Mr. Cleary has insinuated that Ms. Barnes did not increase profits for INTL during her tenure at the Company by saying to various representatives from different

15

companies that, "Ms. Barnes did not make any money, did not do any work and was overpaid." Ms. Barnes sent her resume and made inquiries at various banks and firms including, but not limited to, TD Ameritrade, Mirae Asset Global Investments, ETC, Wedbush, Cantor Fitzgerald, and Société General.  After sending her resume to acquaintances at these institutions, the potential employer would call Mr. Cleary, who then went about spreading false information about Ms. Barnes.

100.　These comments were false and misleading and have impacted Ms. Barnes's professional reputation and ability to find new work.  Various job opportunities and potential employers have not pursued or continued with Ms. Barnes's candidacy for employment despite her qualifications for the positions in question.  Ms. Barnes is aware of various individuals both inside and outside INTL who have been privy to these statements by Mr. Cleary.

101.　Naturally, these false statements regarding Ms. Barnes and her professional competence continue to harm Ms. Barnes's professional reputation, as well as her ability to obtain new employment, which undoubtedly is their purpose.

### FIRST CAUSE OF ACTION
### (Gender Discrimination in Violation of Title VII)

102.　Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

103.　By the actions described above, among others, Defendant discriminated against Plaintiff on the basis of her gender in violation of Title VII by subjecting her to disparate treatment based upon her gender, including, but not limited to, denying her equal terms and conditions of her employment, verbal abuse and derogatory comments.

104.　As a direct and proximate result of Defendant's unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an

award of monetary damages and other relief.

105. As a direct and proximate result, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

**SECOND CAUSE OF ACTION**
**(Retaliation in Violation of Title VII)**

106. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

107. By the actions described above, among others, Defendant retaliated against Plaintiff on the basis of her complaints of discrimination by terminating her employment as well as other retaliatory adverse employment actions.

108. As a direct and proximate result of Defendant's unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

109. As a direct and proximate result, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States;

B. An injunction and order permanently restraining Defendant and its members, partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C. An order directing Defendant to reinstate Plaintiff in the position she would have occupied but for Defendants' unlawful conduct;

D. An award of damages against Defendant, or any jointly or severally liable entity or persons, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

E. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for her mental anguish, humiliation, embarrassment, stress and anxiety, damage to her personal and/or professional reputation, emotional pain and suffering and emotional distress;

F. An award of punitive damages in an amount to be determined at trial and to the fullest extent permitted by law;

G. An award of liquidated damages;

H. Prejudgment interest on all amounts due;

I. An award of costs incurred by Plaintiff in prosecuting this action, as well Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

J. Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: New York, New York
       February 18, 2020                        Respectfully submitted,

                                                       **WIGDOR LLP**

                                         By: _____
                                                      Lawrence M. Pearson
                                                      Julia Elmaleh-Sachs

                                           85 Fifth Avenue
                                           New York, New York 10003
                                           Telephone:  (212) 257-6800
                                           Facsimile:  (212) 257-6845
                                           lpearson@wigdorlaw.com
                                           jelmaleh-sachs@wigdorlaw.com

                                           *Counsel for Plaintiff*